Ewing, McMillin & Willis
C. David Ewing
1100 Republic Building
429 W. Muhammad Ali Boulevard
Louisville, KY 40202
Tel: (502) 585-5800
Fax: (202) 585-5858

Cohen Milstein Sellers & Toll PLLC
Steven J. Toll
Daniel S. Sommers
Joshua M. Kolsky
1100 New York Avenue N.W.
West Tower, Suite 500
Washington, DC 20005-3964
Tel: (202) 408-4600
Fax: (202) 408-4699

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF KENTUCKY

### AT LOUISVILLE

| | |
|---|---|
| PETER BARCIA, Individually and On Behalf of All Others Similarly Situated, ) ) ) ) | |
| Plaintiff, ) | CIVIL ACTION NO. 3:10-cv-577-S |
| ) | **CLASS ACTION** |
| vs. ) | |
| ) | COMPLAINT FOR VIOLATIONS |
| ALMOST FAMILY, INC., WILLIAM B. ) | OF THE FEDERAL SECURITIES |
| YARMUTH, and C. STEVEN GUENTHNER ) | LAWS |
| ) ) ) | |
| Defendants. ) ) ) | **DEMAND FOR JURY TRIAL** |

Plaintiff, Peter Barcia ("Plaintiff"), brings this class action on behalf of all investors who purchased or otherwise acquired the common stock of Almost Family, Inc. ("Almost Family" or the "Company") between August 5, 2008 and June 30, 2010, inclusive (the "Class Period"), against Almost Family and certain of its officers and/or directors. Plaintiff alleges the following based upon the investigation of Plaintiff's counsel, which included, among other things, a review of Defendants' public documents, conference calls and announcements, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Almost Family, securities analysts' reports and advisories about the Company, and news reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

1.     The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

2.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act.

3.     Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in the Louisville Jury Division of this District.

4.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

5.     Plaintiff Peter Barcia purchased the common stock of Almost Family during the Class Period and has been damaged thereby, as set forth in the accompanying certification and incorporated by reference herein. (Exhibit A).

6.     Defendant Almost Family is incorporated in Delaware and maintains its principal executive office at 9510 Ormsby Station Road, Suite 300, Louisville, Kentucky 40223, in Jefferson County, Kentucky.

7.     Defendant William B. Yarmuth ("Yarmuth"), a resident of Jefferson County, Kentucky, is, and was at all relevant times, President, Chief Executive Officer and Chairman of the Board of Almost Family.

8.     Defendant C. Steven Guenthner ("Guenthner"), a resident of Jefferson County, Kentucky, is, and was at all relevant times, Senior Vice President and Chief Financial Officer of Almost Family.  During the Class Period, while Almost Family's stock price was artificially inflated, Defendant Guenthner sold 20,000 shares of his Almost Family stock at $42.04 per share for insider trading proceeds of more than $840,000.

9.     Defendants Yarmuth and Guenthner are collectively referred to herein as the "Individual Defendants."

10.    The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of § 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual

2

Defendants were able to and did, directly or indirectly, control the conduct of Almost Family's business.

11.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

12.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Almost Family's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  Defendants deceived the investing public regarding Almost Family's business, operations and management and the intrinsic value of Almost Family's securities and caused plaintiff and members of the Class to purchase Almost Family common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

13.     Almost Family was founded in 1976, and is the leading regional provider of home health nursing services, with over 100 locations in eleven states. Almost Family and its subsidiaries operate two segments, a Medicare-certified visiting nurse segment, which is 85% of the Company's business, and a personal care segment.  The visiting nurse segment is commonly referred to as the "Medicare certified home health business, skilled intermittent care." The goal of Almost Family is to allow seniors to remain in their homes as long as possible.  The average

patient is over 80 years old with many co-morbid conditions.  The Company's services are covered by federal and state government programs, commercial insurance, as well as private pay.

14.     Prior to and during the Class Period, Almost Family violated federal laws pertaining to Medicare by billing a higher number of home therapy visits for their Medicare patients than was medically appropriate, in order to increase their Medicare reimbursements.

15.     Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Defendants repeatedly touted the Company's financial results and claimed that the Company was in compliance with applicable laws.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (a) the Company's reported sales and earnings growth was materially impacted by a scheme whereby the Company intentionally increased the number of in-home therapy visits to patients for the purpose of triggering higher reimbursement rates under the Medicare home health prospective payment system, as those excess visits were not always medically necessary; (b) the Company's reported sales and earnings were inflated by Defendants' scheme and subject to recoupment by Medicare; (c) the Company was in material violation of federal law and its Code of Ethics & Business Conduct, at all relevant times, due to the scheme to inflate its Medicare revenues; and (d) based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company and its financial performance, prospects, and growth.

16.     As a direct result of Defendants' false statements, Almost Family's common stock traded at artificially inflated prices during the Class Period, reaching a high of $51.47 per share on November 7, 2008.

17.     On April 26, 2010, The Wall Street Journal published an article entitled "Home Care Yields Medicare Bounty."  The article called into question whether Almost Family and its

4

competitors had abused the Medicare reimbursement system and were now improperly taking advantage of a change in the Medicare reimbursement system by increasing the number of in-home therapy visits for patients. The change, which occurred in 2008, provided for additional payments at 6, 14 and 20 therapy visits. The article stated, in pertinent part:

> [A]n analysis by The Wall Street Journal of Medicare payments to home health-care companies in recent years raises questions about whether some companies – including the sector's largest, Amedisys Inc. – are taking advantage of the Medicare reimbursement system. The results show that the number of in home therapy visits tracks Medicare financial incentives.
>
> \*     \*     \*
>
> Medicare reimbursements are determined in part by the number of at-home therapy visits each patient receives, with an extra fee kicking in as soon as a patient hits a certain number of visits. Between 2000 and 2007, Medicare paid companies a flat fee of about $2,200 for up to nine home therapy visits. It paid an additional reimbursement of roughly $2,200 if the therapy surpassed nine visits. That incentive was designed so that agencies didn't "stint" on therapy visits, says Laurence Wilson, the director of chronic-care policy group at the Centers for Medicare and Medicaid Services, the agency that runs Medicare.
>
> According to The Journal analysis, which was based on publicly available Medicare records, Amedisys provided many of its patients just enough therapy visits to trigger the extra $2,200 payment. In 2005, 2006 and 2007, very few Amedisys patients received nine therapy visits while a much higher percentage got 10 visits or more. In 2007, for instance, only 2.88% of patients got nine visits, while 9.53% of patients got 10 visits.
>
> "I was told 'we have to have ten visits to get paid," says Tracy Trusler, a former Amedisys nurse for two years in Tennessee, who has since left the company.
>
> Her supervisors, she says, asked her to look through patients' files to find those who were just shy of the 10-visit mark and call their assigned therapists to remind them to make the extra appointment.
>
> "The tenth visit was not always medically necessary," Ms. Trusler says.
>
> \*     \*     \*
>
> Medicare reimbursements for the entire home health-care industry are coming under increased scrutiny. The federal agency that advises Congress on Medicare payment issues, the Medicare Payment Advisory Commission, or MedPAC, warned last month that home health "overpayments contribute to the

insolvency" of the Medicare trust fund as well as premium increases that beneficiaries must pay.

\*      \*      \*

It wasn't until the change was made that MedPAC noticed the questionable home visit patterns. In its March report, the agency said that the industry-wide percentage of therapy visits in the 10-to-13 range dropped by about a third after the policy change in 2008.

The pattern of clustered visits around reimbursement targets is continuing: MedPAC found the number of therapy visits numbering six, 14 and 20 increased after the policy was changed in 2008.

During a MedPAC meeting in December, Arnold Milstein, a MedPAC commissioner, questioned whether all the home visits were appropriate. "Looking at the great speed with which the volume of services adapts to payment changes, which are breathtaking, it does suggest that there may be a problem with certifying the appropriateness of these services," Mr. Milstein said, according to a transcript of the meeting.

Based on the report, MedPAC suggested for the first time last month that the Secretary of Health and Human Services "review home health agencies that exhibit unusual patterns of claims for payment."

The Journal analysis found a similar pattern: In 2008, the percentage of Amedisys patients getting 10 visits dropped by 50%, while the percentage that got six visits increased 8%. The percentage of patients getting 14 visits rose 33% and the percentage getting 20 visits increased 41%.

\*      \*      \*

Through 2007, an agency would receive the additional $2,200 if it sent a therapist to a patient's home 10 or more times during the same period.

The generous Medicare reimbursements are one reason the home health-care industry has grown so swiftly, according to MedPAC. There are now more than 10,400 home-health agencies in the U.S., up nearly 50% since 2002.

\*      \*      \*

To conduct its analysis, The Journal enlisted Henry Dove, a professor at Yale University's School of Public Health and an expert in analyzing Medicare data. Mr. Dove mined Medicare's database to determine how often between 2005 and 2008 various home-health companies sent therapists to patients' homes during a 60-day period of care, and whether the number of visits coincided with Medicare financial incentives.

Mr. Dove found the pattern of clustering visits at reimbursement trigger points was industry wide. The three other publicly traded home-health companies saw similar movements from 2007 to 2008. LHC Group Inc., for instance, saw the percentage of patients getting 10 visits in 2008 drop by 64% from 2007. For Gentiva Health Services Inc., the 10-visit percentage fell 27%, and at Almost Family Inc., the percentage fell 39%.

\*       \*       \*

Steven Guenthner, chief financial officer of Almost Family, said that when Medicare revised its reimbursement rates in 2000 – creating a bonus of about $2,200 for patients reaching 10 therapy visits – the policy had "a serious flaw." The rates encouraged home health agencies, including Almost Family, to seek out patients who had illnesses that required at least 10 visits, Mr. Guenthner said. Almost Family focused on hip and knee problems because those patients tend to need 10 to 13 therapy visits, he said.

Illnesses that require fewer visits may not get as much attention under the Medicare reimbursement rules. "It's not that we turned down patients," Mr. Guenthner said. "It's where you focus your scarce resources." The combination of limited home health resources to attract patients and the government's reimbursement policy "was like a moth to a flame," he said.

18.   In response to the April 26, 2010 Wall Street Journal article, on May 13, 2010, U.S. Senate Finance Committee Chairman Max Baucus and Ranking Member Chuck Grassley sent a letter to Almost Family questioning the connection between the number of home health therapy visits and the Medicare reimbursement rates for those visits.   The Senators further requested that Almost Family "answer questions related to their internal policies and guidelines regarding the number of visits . . . and the rate of reimbursements" and "provide marketing materials and guidelines for patients and physicians as well as clinical criteria used in developing those materials."

19.   On July 1, 2010, before the market opened, Almost Family announced that the Company had received a civil subpoena for documents and a notice of an investigation from the SEC.   The subpoena seeks all documents relating to "the Company's home health care services and operations, including reimbursements under the Medicare home health prospective payment

system, since January 1, 2000." As a result of this negative news, Almost Family's common stock plunged $3.88 per share or 11.11%, on July 1, 2010, on high volume.

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

**A.      False and Misleading Statements Regarding Financial Performance and Medicare Reimbursement**

20.      The Class Period begins on August 5, 2008. On that day, Almost Family issued a press release announcing its results for the second quarter of 2008. The press release stated:

**Second Quarter Financial Results**

Almost Family reported second quarter 2008 net service revenues of $48.7 million, a 50% increase from $32.5 million in the second quarter of 2007. Operating income for the second quarter of 2008 increased to 14% of net service revenues versus 11% for the second quarter of 2007.

Net income for the second quarter of 2008 was $3.9 million, or $0.50 per diluted share, compared to $2.0 million, or $0.35 per diluted share, in the second quarter of 2007. The weighted average shares outstanding for purposes of calculating diluted earnings per share increased 39% between periods as the Company completed a common stock offering, of 2,512,500 shares in the second quarter of 2008.

The number of days sales outstanding in accounts receivable, or DSO, for the three months ended June 30, 2008, decreased to 47 days, compared to 51 days for the three months ended March 31, 2008. The decline in DSO was attributable to resolved billing issues related to Medicare claims, partially offset by rapid growth from acquisitions and organic initiatives.

**Second Quarter Segment Results**

Net revenues in the Visiting Nurse segment for the second quarter of 2008 were $38.9 million, a 66% increase from $23.5 million in the second quarter of 2007. The total revenue growth of $15.4 million came from a 33% organic growth rate plus $7.6 million from acquired operations. Operating income before corporate expense in the VN segment for the second quarter 2008 was $8.6 million, an 88% increase from $4.6 million in the second quarter 2007.

Net revenues in the Personal Care (PC) segment for the second quarter of 2008 were $9.8 million, a 9% increase from $9.0 million in the second quarter of 2007. Operating income before corporate expense in the PC segment for the second quarter of 2008 was $821,000.

**Six Month Period Ended June 30, 2008**

Almost Family reported net service revenues for the six month period ended June 30, 2008 of $87.7 million, a 37% increase from $64.3 million in the same period last year. Operating income for the six month period increased to 13% of net service revenues versus 11% for the prior year period.

Net income for the six month period was $6.4 million, or $0.95 per diluted share, compared to $3.6 million, or $0.65 per diluted share, in the prior year period. The weighted average shares outstanding for purposes of calculating diluted earnings per share increased 21% between periods.
Six Month Period Segment Results

Net revenues in the Visiting Nurse (VN) segment for the six month period of 2008 were $68.7 million, a 48% increase from $46.5 million in the same period last year. The total revenue growth of $22.2 million came from a 25% organic growth rate plus $10.6 million from acquired operations. The six month results included results from the Quality of Life acquisition completed in late October of 2007 and results from the Apex Home Healthcare acquisition completed in late March 2008. Operating income before corporate expense in the VN segment for the six month period was $14.0 million, a 58% increase from $8.9 million in the same period last year.

Net revenues in the Personal Care (PC) segment for the six month period were $19.0 million, a 7% increase from $17.8 million in the same period last year. Operating income before corporate expense in the PC segment for the six month period was $1.6 million, a 9% decrease from $1.7 million in the same period last year.

21.     Also on August 5, 2008, the Company filed with the SEC its quarterly report on Form 10-Q for the period ending June 30, 2008 ("2Q-2008 10-Q"). The 2Q-2008 10-Q was signed by Defendants Yarmuth and Guenthner and reiterated the Company's financial results. In addition, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), the 2Q-2008 10-Q contained certifications signed by Defendants Yarmuth and Guenthner stating that the 2Q-2008 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

22.     Regarding the Company's Medicare reimbursement, the 2Q-2008 10-Q stated:

**2. Net Revenues**

The Company is paid for its services primarily by Federal and state third-party reimbursement programs, commercial insurance companies, and patients. Revenues are recorded at established rates in the period during which the services are rendered. Appropriate allowances to give recognition to third party payment arrangements are recorded when the services are rendered.

* * *

**3. Segment Data**

The Company has two reportable segments, Visiting Nurse (VN) and Personal Care (PC). . . .

The Company's VN segment provides skilled medical services in patients' homes largely to enable recipients to reduce or avoid periods of hospitalization and/or nursing home care. VN Medicare revenues are generated on a per episode basis rather than a fee per visit or day of care. Approximately 94% of the VN segment revenues are generated from the Medicare program while the balance is generated from Medicaid and private insurance programs.

The Company's PC segment services are also provided in patients' homes. These services (generally provided by paraprofessional staff such as home health aides) are generally of a custodial rather than skilled nature. PC revenues are generated on an hourly basis. Approximately 70% of the PC segment revenues are generated from Medicaid and other government programs while the balance is generated from insurance programs and private pay patients.

23.     On November 5, 2008, Almost Family issued a press release announcing its results for the third quarter of 2008.  The press release stated:

**Third Quarter Financial Results**

Almost Family reported third quarter 2008 net service revenues of $58.7 million, an 84% increase from $32 million in the third quarter of 2007. Operating income for the third quarter of 2008 increased to 13% of net service revenues versus 11% for the third quarter of 2007.

Net income for the third quarter of 2008 increased almost 150% to $4.7 million, or $0.56 per diluted share, compared to $1.9 million, or $0.34 per diluted share, in the third quarter of 2007. The weighted average shares outstanding for purposes of calculating diluted earnings per share increased 49% between periods. Third Quarter Segment Results

Net revenues in the Visiting Nurse segment for the third quarter of 2008 were $48.6 million, a 113% increase from $22.9 million in the third quarter of 2007. The total revenue growth of $25.7 million came from a 44% organic growth

rate plus $15.7 million from acquired operations. The Patient Care acquisition completed on August 1st was in the quarter for 2 months and contributed about $7.6 million in revenue. Operating income before corporate expense in the VN segment for the third quarter 2008 was $10.0 million, a 130% increase from $4.3 million in the third quarter 2007. Net revenues in the Personal Care (PC) segment for the third quarter of 2008 were $10.1 million, an 11% increase from $9.1 million in the third quarter of 2007. Operating income before corporate expense in the PC segment for the third quarter of 2008 was $914,000.

**Nine Month Period Ended September 30, 2008**

Almost Family reported net service revenues for the nine month period ended September 30, 2008 of $146.4 million, a 52% increase from $96.3 million in the same period last year. Operating income for the nine month period increased to 13% of net service revenues versus 11% for the prior year period. Net income for the nine month period was $11.1 million, or $1.52 per diluted share, compared to $5.5 million, or $0.99 per diluted share, in the prior year period. The weighted average shares outstanding for purposes of calculating diluted earnings per share increased 30% between periods.

**Nine Month Period Segment Results**

Net revenues in the Visiting Nurse (VN) segment for the nine month period of 2008 were $117.3 million, a 69% increase from $69.4 million in the same period last year. The total revenue growth of $47.9 million came from a 31% organic growth rate plus $26.3 million from acquired operations. The Patient Care acquisition contributed about $7.6 million in revenue. Operating income before corporate expense in the VN segment for the nine month period was $24.0 million, an 82% increase from $13.2 million in the same period last year. Net revenues in the Personal Care (PC) segment for the nine month period were $29.1 million, an 8% increase from $26.9 million in the same period last year. Operating income before corporate expense in the PC segment for the nine month period was $2.5 million, a 6% decrease from $2.6 million in the same period last year.

24.     Also on November 5, 2008, the Company filed with the SEC its quarterly report on Form 10-Q for the period ending September 30, 2008 ("3Q-2008 10-Q"). The 3Q-2008 10-Q was signed by Defendants Yarmuth and Guenthner and reiterated the Company's financial results. In addition, pursuant to SOX, the 3Q-2008 10-Q contained certifications signed by Defendants Yarmuth and Guenthner stating that the 3Q-2008 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements

made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

25.     Regarding the Company's Medicare reimbursement, the 3Q-2008 10-Q stated:

**2. Net Revenues**

The Company is paid for its services primarily by federal and state third-party reimbursement programs, commercial insurance companies, and patients. Revenues are recorded at established rates in the period during which the services are rendered. Appropriate allowances to give recognition to third party payment arrangements are recorded when the services are rendered.

\* \* \*

**3. Segment Data**

The Company has two reportable segments, Visiting Nurse (VN) and Personal Care (PC). . . .

The Company's VN segment provides skilled medical services in patients' homes largely to enable recipients to reduce or avoid periods of hospitalization and/or nursing home care. VN Medicare revenues are generated on a per episode basis rather than a fee per visit or day of care. Approximately 92% of the VN segment revenues are generated from the Medicare program while the balance is generated from Medicaid and private insurance programs.

The Company's PC segment services are also provided in patients' homes. These services (generally provided by paraprofessional staff such as home health aides) are generally of a custodial rather than skilled nature. PC revenues are generated on an hourly basis. Approximately 68% of the PC segment revenues are generated from Medicaid and other government programs while the balance is generated from insurance programs and private pay patients.

26.     On March 4, 2009, Almost Family issued a press release announcing its results for the fourth quarter of 2008 and 2008 full year. The press release stated:

**Fourth Quarter Financial Results**

Almost Family reported fourth quarter 2008 net service revenues of $66.2 million, an 84% increase from $35.9 million in the fourth quarter of 2007. Net income for the fourth quarter of 2008 increased to 7.9% of net service revenues versus 5.8% for the fourth quarter of 2007.

Net income for the fourth quarter of 2008 was $5.2 million, or $0.62 per diluted share, compared to $2.1 million, or $0.37 per diluted share, in the fourth

quarter of 2007. The weighted average shares outstanding for purposes of calculating diluted earnings per share increased 48% between periods.

## Fourth Quarter Segment Results

Net revenues in the Visiting Nurse segment for the fourth quarter of 2008 were $55.7 million, a 108% increase from $26.8 million in the fourth quarter of 2007. The total revenue growth of $28.9 million came from a 47% organic growth rate plus $20.1 million from acquired operations. Operating income before corporate expense in the VN segment for the fourth quarter 2008 was $12.6 million, a 145% increase from $5.2 million in the fourth quarter of 2007. Net revenues in the Personal Care (PC) segment for the fourth quarter of 2008 were $10.5 million, a 16% increase from $9.1 million in the fourth quarter of 2007. Operating income before corporate expense in the PC segment for the fourth quarter of 2008 was $1.4 million, a 67% increase from $819,000 in the fourth quarter of 2007.

## Full Year Financial Results

Almost Family reported net service revenues for the twelve month period ended December 31, 2008 of $212.6 million, a 61% increase from $132.1 million in the same period last year. Net income for the twelve month period increased to 7.7% of net service revenues versus 5.9% for the prior year period. Net income for the twelve month period was $16.3 million, or $2.16 per diluted share, compared to $7.6 million, or $1.36 per diluted share, in the prior year period. The weighted average shares outstanding for purposes of calculating diluted earnings per share increased 35% between periods.

## Full Year Segment Results

Net revenues in the Visiting Nurse segment for the twelve month period of 2008 were $173.0 million, an 80% increase from $96.2 million in the same period last year. The total revenue growth of $76.8 million came from a 36% organic growth rate plus $47.4 million from acquired operations. The twelve month results for the period ended 2008 included results from the Apex Home Healthcare acquisition completed in late March 2008, the Patient Care acquisition completed in August 2008 and the Fairfield Ohio Medical Center Home Health Agency acquisition completed in November 2008. The twelve month results from the period ended 2007 included results from the Quality of Life acquisition completed in late October of 2007. Operating income before corporate expense in the VN segment for the twelve month period was $36.6 million, a 99% increase from $18.4 million in the same period last year. Net revenues in the Personal Care segment for the twelve month period were $39.6 million, a 10% increase from $35.9 million in the same period last year. Operating income before corporate expense in the PC segment for the twelve month period was $3.8 million, a 12% increase from $3.4 million in the same period last year.

13

27.     On March 6, 2009, the Company filed with the SEC its annual report on Form 10-K for the year ending December 31, 2008 ("2008 10-K"). The 2008 10-K was signed by Defendants Yarmuth and Guenthner and reiterated the Company's financial results. In addition, pursuant to SOX, the 2008 10-K contained certifications signed by Yarmuth and Guenthner stating that the 2008 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

28.     Regarding the Company's Medicare reimbursement, the 2008 10-K stated:

> The Company is paid for its services primarily by Federal and state third-party reimbursement programs, commercial insurance companies, and patients. Revenues are recorded at established rates in the period during which the services are rendered. Appropriate allowances to give recognition to third party payment arrangements are recorded when the services are rendered.

> * * *

> The Company has two reportable segments, Visiting Nurse (VN) and Personal Care (PC). . . .

> Our VN segment provides skilled medical services in patients' homes largely to enable recipients to reduce or avoid periods of hospitalization and/or nursing home care. VN Medicare revenues are generated on a per episode basis rather than a fee per visit or an hourly basis. 91% of the VN segment revenues are generated from the Medicare program while the balance is generated from Medicaid and private insurance programs.

> Our PC segment services are also provided in patients' homes. These services (generally provided by paraprofessional staff such as home health aides) are generally of a custodial rather than skilled nature. PC revenues are typically generated on an hourly basis. 74% of the PC segment revenues are generated from Medicaid and other government programs while the balance is generated from insurance programs and private pay patients.

29.     On May 6, 2009, Almost Family issued a press release announcing its results for the first quarter of 2009. The press release stated:

**First Quarter Financial Results**

Almost Family reported first quarter 2009 net service revenues of $69.2 million, a 77% increase from $39.0 million in the first quarter of 2008. Net income for the first quarter of 2009 increased to 8.1% of net service revenues versus 6.6% for the first quarter of 2008.

Net income for the first quarter of 2009 was $5.6 million, or $0.68 per diluted share, compared to $2.5 million, or $0.44 per diluted share, in the first quarter of 2008. The weighted average shares outstanding for purposes of calculating diluted earnings per share increased 45% between periods.

**First Quarter Segment Results**

Net revenues in the Visiting Nurse segment for the first quarter of 2009 were $58.7 million, a 97% increase from $29.8 million in the first quarter of 2008. The total revenue growth of $28.9 million came from a 41% organic growth rate plus $16.9 million from acquired operations. Operating income before corporate expense in the VN segment for the first quarter 2009 was $12.1 million, a 123% increase from $5.5 million in the first quarter of 2008.

Net revenues in the Personal Care (PC) segment for the first quarter of 2009 were $10.4 million, a 14% increase from $9.2 million in the first quarter of 2008. Operating income before unallocated corporate expense in the PC segment for the first quarter of 2009 was $1.1 million, a 51% increase from $742,000 in the first quarter of 2008.

30.     Also on May 6, 2009, the Company filed with the SEC its quarterly report on Form 10-Q for the period ending March 31, 2009 ("1Q-2009 10-Q"). The 1Q-2009 10-Q was signed by Defendants Yarmuth and Guenthner and reiterated the Company's financial results. In addition, pursuant to SOX, the 1Q-2009 10-Q contained certifications signed by Yarmuth and Guenthner stating that the 1Q-2009 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

31.     Regarding the Company's Medicare reimbursement, the 1Q-2009 10-Q stated:

**2.      Net Revenues**

The Company is paid for its services primarily by federal and state third-party reimbursement programs, commercial insurance companies, and patients.

Revenues are recorded at established rates in the period during which the services are rendered. Appropriate allowances to give recognition to third party payment arrangements are recorded when the services are rendered.

*  *  *

### 3. Segment Data

The Company has two reportable segments, Visiting Nurse (VN) and Personal Care (PC). . . .

The Company's VN segment provides skilled medical services in patients' homes largely to enable recipients to reduce or avoid periods of hospitalization and/or nursing home care. VN Medicare revenues are generated on a per episode basis rather than a fee per visit or day of care. Approximately 89% of the VN segment revenues are generated from the Medicare program while the balance is generated from Medicaid and private insurance programs.

The Company's PC segment services are also provided in patients' homes. These services (generally provided by paraprofessional staff such as home health aides) are generally of a custodial rather than skilled nature. PC revenues are generated on an hourly basis. Approximately 64% of the PC segment revenues are generated from Medicaid and other government programs while the balance is generated from insurance programs and private pay patients.

32.    On August 5, 2009, Almost Family issued a press release announcing its results for the second quarter of 2009. The press release stated:

### Second Quarter Financial Results

Almost Family reported second quarter 2009 net service revenues of $74.9 million, a 54% increase from $48.7 million in the second quarter of 2008.

Net income for the second quarter of 2009 was $6.0 million, or $0.71 per diluted share, compared to $3.9 million, or $0.50 per diluted share, in the second quarter of 2008. The weighted average shares outstanding for purposes of calculating diluted earnings per share increased 7% between periods. Results for the quarter included acquisition transaction costs of $260,000 or $0.02 per diluted share.

### Second Quarter Segment Results

Net revenues in the Visiting Nurse segment for the second quarter of 2009 were $64.0 million, a 65% increase from $38.8 million in the second quarter of 2008. The total revenue growth of $25.1 million came from a 29% organic growth rate plus $14.0 million from acquired operations    Operating income before

16

corporate expense in the VN segment for the second quarter of 2009 was $13.3 million, a 55% increase from $8.6 million in the second quarter of 2008.

Net revenues in the Personal Care (PC) segment for the second quarter of 2009 were $10.9 million, an 11% increase from $9.8 million in the second quarter of 2008. Operating income before unallocated corporate expense in the PC segment for the second quarter of 2009 was $1.3 million, a 52% increase from $824,000 in the second quarter of 2008.

The Company also noted that its Visiting Nurse segment operations located in Florida normally experience higher admissions during the first quarter and lower admissions during the third quarter than in the other quarters due to seasonal population fluctuations.

**Six Month Period Ended June 30, 2009**

Almost Family reported net service revenues for the six month period ended June 30, 2009 of $144.1 million, a 64% increase from $87.7 million in the same period of 2008.

Net income for the six month period of 2009 was $11.6 million, or $1.40 per diluted share, compared to $6.4 million, or $0.95 per diluted share, in the six month period of 2008.

**Six Month Period Segment Results**

Net revenues in the Visiting Nurse segment for the six month period of 2009 were $122.7 million, a 79% increase from $68.7 million in the six month period of 2008. The total revenue growth of $54.0 million came from a 35% organic growth rate plus $32.0 million from acquired operations. Operating income before corporate expense in the VN segment for the six month period of 2009 was $25.5 million, an 82% increase from $14.0 million in the same period of 2008.

Net revenues in the Personal Care (PC) segment for the six month period of 2009 were $21.3 million, a 12% increase from $19.0 million in the six month period of 2008. Operating income before unallocated corporate expense in the PC segment for the six month period of 2009 was $2.3 million, a 51% increase from $1.6 million in the six month period of 2008.

33.     Also on August 5, 2009, the Company filed with the SEC its quarterly report on Form 10-Q for the period ending June 30, 2009 ("2Q-2009 10-Q"). The 2Q-2009 10-Q was signed by Defendants Yarmuth and Guenthner and reiterated the Company's financial results. In addition, pursuant to SOX, the 2Q-2009 10-Q contained certifications signed by Yarmuth and

17

Guenthner stating that the 2Q-2009 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

34. Regarding the Company's Medicare reimbursement, the 2Q-2009 10-Q stated:

**2. Net Revenues**

The Company is paid for its services primarily by federal and state third-party reimbursement programs, commercial insurance companies and patients. Revenues are recorded at established rates in the period during which the services are rendered. Appropriate allowances to give recognition to third party payment arrangements are recorded when the services are rendered.

* * *

**3. Segment Data**

The Company has two reportable segments, Visiting Nurse (VN) and Personal Care (PC). . . .

The Company's VN segment provides skilled medical services in patients' homes largely to enable recipients to reduce or avoid periods of hospitalization and/or nursing home care. VN Medicare revenues are generated on a per episode basis rather than a fee per visit or day of care. Approximately 89% of the VN segment revenues are generated from the Medicare program while the balance is generated from Medicaid and private insurance programs.

The Company's PC segment services are also provided in patients' homes. These services (generally provided by paraprofessional staff such as home health aides) are generally of a custodial rather than skilled nature. PC revenues are generated on an hourly basis. Approximately 65% of the PC segment revenues are generated from Medicaid and other government programs while the balance is generated from insurance programs and private pay patients.

35. On November 4, 2009, Almost Family issued a press release announcing its financial results for the third quarter of 2009. The press release stated:

**Third Quarter Financial Results**

Almost Family reported third quarter 2009 net service revenues of $76.3 million, a 31% increase from $58.4 million in the third quarter of 2008.

Net income for the third quarter of 2009 was $6.2 million, or $0.73 per diluted share, compared to $4.7 million, or $0.56 per diluted share, in the third quarter of 2008. The weighted average shares outstanding for purposes of calculating diluted earnings per share increased 1% between periods.

### Third Quarter Segment Results

Net revenues in the Visiting Nurse segment for the third quarter of 2009 were $65.7 million, a 35% increase from $48.6 million in the third quarter of 2008. The total revenue growth of $17.1 million came from a 24% organic growth rate plus $7.1 million from acquired operations. Organic Medicare admissions growth was 11% and organic Medicare Episodic growth was 25%. Operating income before corporate expense in the VN segment for the third quarter of 2009 was $13.4 million, a 34% increase from $10.0 million in the third quarter of 2008.

Net revenues in the Personal Care (PC) segment for the third quarter of 2009 were $10.6 million, an 8% increase from $9.8 million in the third quarter of 2008. Operating income before unallocated corporate expense in the PC segment for the third quarter of 2009 was $1.3 million, a 40% increase from $902,000 in the third quarter of 2008.

The Company also noted that its Visiting Nurse segment operations located in Florida normally experience higher admissions during the first quarter and lower admissions during the third quarter than in the other quarters due to seasonal population fluctuations.

### Nine Month Period Ended September 30, 2009

Almost Family reported net service revenues for the nine month period ended September 30, 2009 of $219.8 million, a 51% increase from $145.6 million in the same period of 2008.

Net income for the nine month period of 2009 was $17.8 million, or $2.14 per diluted share, compared to $11.1 million, or $1.52 per diluted share, in the nine month period of 2008.

### Nine Month Period Segment Results

Net revenues in the Visiting Nurse segment for the nine month period of 2009 were $188.4 million, a 61% increase from $117.3 million in the nine month period of 2008. The total revenue growth of $71.1 million came from a 32% organic growth rate plus $39.7 million from acquired operations. Operating income before corporate expense in the VN segment for the nine month period of 2009 was $38.9 million, a 62% increase from $24.0 million in the same period of 2008.

Net revenues in the Personal Care (PC) segment for the nine month period of 2009 were $31.4 million, an 11% increase from $28.3 million in the nine month period of 2008. Operating income before unallocated corporate expense in the PC

segment for the nine month period of 2009 was $3.6 million, a 48% increase from $2.4 million in the nine month period of 2008.

36.     Also on November 4, 2009, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2009 ("3Q-2009 10-Q"). The Company's 3Q-2009 10-Q was signed by Defendants Yarmuth and Guenthner and reiterated the Company's financial results. In addition, pursuant to SOX, the 3Q-2009 10-Q contained certifications signed by Defendants Yarmuth and Guenthner stating that the 3Q-2009 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

37.     Regarding the Company's Medicare reimbursement, the 3Q-2009 10-Q stated:

**2. Net Revenues**

The Company is paid for its services primarily by federal and state third-party reimbursement programs, commercial insurance companies and patients. Revenues are recorded at established rates in the period during which the services are rendered. Appropriate allowances to give recognition to third party payment arrangements are recorded when the services are rendered.

\* \* \*

**3. Segment Data**

The Company has two reportable segments, Visiting Nurse (VN) and Personal Care (PC). . . .

The Company's VN segment provides skilled medical services in patients' homes largely to enable recipients to reduce or avoid periods of hospitalization and/or nursing home care. VN Medicare revenues are generated on a per episode basis rather than a fee per visit or day of care. Approximately 90% of the VN segment revenues are generated from the Medicare program while the balance is generated from Medicaid and private insurance programs.

The Company's PC segment services are also provided in patients' homes. These services (generally provided by paraprofessional staff such as home health aides) are generally of a custodial rather than skilled nature. PC revenues are generated on an hourly basis. Approximately 66% of the PC segment revenues are generated

from Medicaid and other government programs while the balance is generated from insurance programs and private pay patients.

38.     On February 24, 2010, Almost Family issued a press release announcing its financial results for the fourth quarter of 2009 and the 2009 full year. The press release stated:

**Fourth Quarter Financial Results**

Almost Family reported fourth quarter 2009 net service revenues of $78.0 million, an 18.4% increase from $65.9 million in the fourth quarter of 2008.

Net income for the fourth quarter of 2009 was $6.8 million, or $0.73 per diluted share, compared to $5.2 million, or $0.62 per diluted share, in the fourth quarter of 2008. The weighted average shares outstanding for purposes of calculating diluted earnings per share increased 11% between periods. Results for the quarter included costs of $238,000 or $0.03 per diluted share related to a terminated acquisition.

**Fourth Quarter Segment Results**

Net revenues in the Visiting Nurse segment for the fourth quarter of 2009 were $67.6 million, a 22% increase from $55.7 million in the fourth quarter of 2008. The total revenue growth of $12.0 million came from a 19% organic growth rate plus $1.3 million from acquired operations. Organic Medicare admissions growth was 13% and organic Medicare Episodic growth was 18%. Operating income before corporate expense in the VN segment for the fourth quarter of 2009 was $14.9 million, an 18% increase from $12.6 million in the fourth quarter of 2008.

Net revenues in the Personal Care (PC) segment for the fourth quarter of 2009 were $10.4 million, a 2% increase from $10.2 million in the fourth quarter of 2008. Operating income before unallocated corporate expense in the PC segment for the fourth quarter of 2009 was $1.5 million, a 14% increase from $1.3 million in the fourth quarter of 2008.

**Full Year Financial Results**

Almost Family reported net service revenues for the twelve month period ended December 31, 2009 of $297.8 million, a 41% increase from $211.5 million in the same period of 2008.

Net income for the twelve month period of 2009 was $24.6 million, or $2.86 per diluted share, compared to $16.3 million, or $2.16 per diluted share, in the twelve month period of 2008. Results for the twelve month period of 2009 included acquisition transactions costs of $463,000 or $0.06 per diluted share.

**Full Year Segment Results**

Net revenues in the Visiting Nurse segment for the twelve month period of 2009 were $256.1 million, a 48% increase from $173.0 million in the twelve month period of 2008. The total revenue growth of $83.1 million came from a 29% organic growth rate plus $43.8 million from acquired operations. Operating income before corporate expense in the VN segment for the twelve month period of 2009 was $53.8 million, a 47% increase from $36.6 million in the same period of 2008.

Net revenues in the Personal Care (PC) segment for the twelve month period of 2009 were $41.8 million, an 8% increase from $38.5 million in the twelve month period of 2008. Operating income before unallocated corporate expense in the PC segment for the twelve month period of 2009 was $5.2 million, a 37% increase from $3.8 million in the twelve month period of 2008.

39.     On February 25, 2010, Almost Family filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2009 ("2009 10-K"). The Company's 2009 10-K was signed by Defendants Yarmuth and Guenthner and reiterated the Company's financial results. In addition, pursuant to SOX, the 2009 10-K contained certifications signed by Defendants Yarmuth and Guenthner stating that the 2009 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

40.     Regarding the Company's Medicare reimbursement, the 2009 10-K stated:

***Medicare Rates***

On October 1, 2000, Medicare implemented the Prospective Payment System ("PPS") and began paying providers of home health care at fixed, predetermined rates for services and supplies bundled into 60-day episodes of home health care. An episode of home health care spans a 60-day period, starting with the first day a billable visit is furnished to a Medicare beneficiary and ending 60 days later. If a patient is still in treatment on the 60th day a new episode begins on the 61st day regardless of whether a billable visit is rendered on that day and ends 60 days later. The first day of a consecutive episode, therefore, is not necessarily the new episode's first billable visit. A base episode payment is established by the Medicare Program through federal legislation for all episodes of care ended on or after the applicable time periods detailed below:

| Period | Base episode Payment (1) | |
|---|---|---|
| January 1, 2007 through December 31, 2007 | $ | 2,339 |
| January 1, 2008 through December 31, 2008 | $ | 2,270 |
| January 1, 2009 through December 31, 2009 | $ | 2,272 |
| January 1, 2010 through December 31, 2010 | $ | 2,313 |

(1)     The actual episode payment rates, as presented in the table vary, depending on the home health resource groups ("HHRGs") to which Medicare patients are assigned and the per episode payment is typically reduced or increased by such factors as the patient's clinical, functional, and services utilization characteristics.

Under PPS for Medicare reimbursement, we record net revenues based on reimbursement rate that varies based on the severity of the patient's condition, service needs and other related factors. We record net revenues as services are rendered to patients over the 60-day episode period. At the end of each month, a portion of our revenue is estimated for episodes in progress.

Medicare reimbursement on an episodic basis, is subject to change if the actual number of therapy visits differs from the number anticipated at the start of care or if the patient is discharged but readmitted to another agency within the same 60-day episodic period. Our revenue recognition under the Medicare reimbursement program is based on certain variables including, but not limited, to: (i) changes in the base episode payments established by the Medicare Program; (ii) adjustments to the base episode payments for partial episodes and for other factors, such as case mix, geographic wages, low utilization and intervening events; and, (iii) recoveries of overpayments. Adjustments to revenue result from differences between estimated and actual reimbursement amounts, an inability to obtain appropriate billing documentation or authorizations acceptable to the payor and other reasons unrelated to credit risk. We recognize Medicare revenue on an episode-by-episode basis during the course of each episode over its expected number of visits.

In October 2009 the Centers for Medicare & Medicaid Services ("CMS") published regulations specifying Medicare home health reimbursement rates for 2010. Medicare rates for 2010 include a "market basket update" rate increase of 2.0% plus a 2.5% "outlier policy" adjustment less a 2.75% "case mix creep" adjustment. Accordingly, 2010 Medicare rates are about 1.75% higher than in 2009.

41.     On April 28, 2010, Almost Family issued a press release announcing its financial results for the first quarter of 2010.  The press release stated:

**First Quarter Financial Results**

Almost Family reported first quarter 2010 net service revenues of $81.8 million, an 18.6% increase from $68.9 million in the first quarter of 2009.

Net income for the first quarter of 2010 was $7.4 million, or $0.80 per diluted share, compared to $5.6 million, or $0.68 per diluted share, in the first quarter of 2009. The weighted average shares outstanding for purposes of calculating diluted earnings per share increased 13% between periods.

**First Quarter Segment Results**

Net revenues in the Visiting Nurse segment for the first quarter of 2010 were $71.5 million, a 22% increase from $58.7 million in the first quarter of 2009. The total revenue growth of $12.8 million came from a 17% organic growth rate plus $1.0 million from acquired operations. Organic Medicare admissions growth was 13% and organic Medicare Episodic growth was 16%. Operating income before corporate expense in the VN segment for the first quarter of 2010 was $15.9 million, a 30% increase from $12.2 million in the first quarter of 2009.

Net revenues in the Personal Care (PC) segment for the first quarter of 2010 were flat at $10.2 million for the first quarter of 2010 and 2009. Operating income before unallocated corporate expense in the PC segment for the first quarter of 2010 was $1.3 million, a 13% increase from $1.1 million in the first quarter of 2009.

42.     Also on April 28, 2010, the Company filed a press release correcting a typographical error. The Company's Form 8-K/A containing the press release stated, as follows:

On April 28, 2010, Almost Family, Inc. (the "Company") issued a press release announcing its financial results for the quarter ended March 31, 2010, a copy of which was filed on Form 8-K. The purpose of this Form 8-K/A is to correct a typographical error in the second sentence of the first paragraph under the heading "First Quarter Segment Results" in the press release. As corrected, the sentence should read in its entirety as follows: "The total revenue growth of $12.8 million came from a 20% organic growth rate plus $1.0 million from acquired operations."

43.     On April 29, 2010, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended March 31, 2010 ("1Q-2010 10-Q"). The 1Q-2010 10-Q was signed by Defendants Yarmuth and Guenthner and reiterated the Company's financial results. In addition, pursuant to SOX, the 1Q-2010 10-Q contained certifications signed by Defendants Yarmuth and Guenthner stating that the 1Q-2010 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements

made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

44.     Regarding the Company's Medicare reimbursement, the 1Q-2010 10-Q stated:

**2. Net Service Revenues**

The Company is paid for its services primarily by federal and state third-party reimbursement programs, commercial insurance companies and patients. Revenues are recorded at established rates in the period during which the services are rendered. Appropriate allowances to give recognition to third party payment arrangements are recorded when the services are rendered.

*       *       *

**3. Segment Data**

The Company has two reportable segments, Visiting Nurse (VN) and Personal Care (PC). . . .

The Company's VN segment provides skilled medical services in patients' homes largely to enable recipients to reduce or avoid periods of hospitalization and/or nursing home care. VN Medicare revenues are generated on a per episode basis rather than a fee per visit or day of care. Approximately 92% of the VN segment revenues are generated from the Medicare program while the balance is generated from Medicaid and private insurance programs.

The Company's PC segment services are also provided in patients' homes.These services (generally provided by paraprofessional staff such as home health aides) are generally of a custodial rather than skilled nature. PC revenues are generated on an hourly basis. Approximately 68% of the PC segment revenues are generated from Medicaid and other government programs while the balance is generated from insurance programs and private pay patients.

45.     On May 12, 2010, Almost Family's stock closed at $42.59 per share. It was on that day that Guenthner sold 20,000 shares of his Almost Family stock at $42.04 per share, reaping proceeds of approximately $840,000.

46.     The statements above regarding the Company's financial results and Medicare reimbursement were false and misleading because Defendants failed to disclose: (a) that the Company's reported sales and earnings growth were materially impacted by a scheme whereby the Company intentionally increased the number of in-home therapy visits to patients for the

purpose of triggering higher reimbursement rates under the Medicare home health prospective payment system, as those excess visits were not always medically necessary; (b) that the Company's reported sales and earnings were artificially inflated by the scheme and subject to recoupment by Medicare; and (c) that, based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, its prospects, financial performance, and growth.

**B.       False and Misleading Statements Regarding Compliance with Law**

47.      The 2008 10-K and 2009 10-K both stated: "We believe that we are in material compliance with applicable laws."

48.      The Company's Code of Ethics & Business Conduct which is included on the Company's Corporate Compliance page of its website, states:

**Provide Accurate and Complete Documentation**

Client care must be necessary, appropriate and well documented. We must ensure the medical necessity of the care provided and verify client eligibility as needed. In addition, we will accurately record all services provided, and document physician authorization.

Improper coding of services and care provided (i.e., upcoding, fragmentation, use of obsolete or inappropriate coding) will not be tolerated and will result in immediate sanctions (i.e., disciplinary action, termination, substantial fines).

**Always Obey the Law**

We will conduct our business in accordance with all applicable laws and regulations. Compliance with the law does not compromise our ethical responsibility. Rather, it provides the minimum, absolute, essential condition for performance of our duties.

\*   \*   \*

**Generate Accurate Billing and Claims**

We will generate billing and claims accurately reflecting that services rendered are supported by relevant documentation and are submitted in compliance with applicable laws, rules, regulations and program requirements.

We will never intentionally make or present improper, false, fictitious or fraudulent claims to any government or private health care program, employee, department or agency. Honesty and accuracy in billing and in the making of claims for Medicare or Medicaid payment is vital.

49.     On April 28, 2010, the Company hosted a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendant Yarmuth addressed the April 26, 2010 Wall Street Journal article as follows:

Well, we probably have a lot of comments. I think that both Steve and I have some discussions about – we had some thoughts about it and we think – basically we believe that some of the information or the article was to some degree – I think Steve had a quote in there that said that he thought that the reimbursement system was – had some serious flaws in it. And I think we sort of believe that the article had some serious flaws in it also in terms of its – some of the numbers and the issues.

We did not to my knowledge confirm or agree with the data that was presented to us in that article. But generally, I think our read of the article was [sic] essentially goes like this that the federal government realized that the reimbursement system had some flaws in it from 2000 and that they put – changed the reimbursement system in 2008. And there's a quote in the – and the quote in the article from somebody from – Mr. Wilson from CMS who talked about the – their intent in changing the reimbursement in 2008 was to create some incentive for essentially providers to care for those who were in need. And that obviously they thought that there were people in the industry or people who were in need of home healthcare who weren't being potentially serviced because of flaws in the reimbursement system. And they changed those to put incentives in place for that to happen. And the industry responded, as we did, in terms of taking care of patients who otherwise – who we did not take care of in the previous year, in 2007.

So we were taking care of a lot of different people in 2008 than we were taking care of in 2007 who had different medical conditions and different clinical needs and different needs – levels of service. And we, as we always do, go about trying to provide the care that the patient needs based upon their clinical condition. And I think that the – in some ways the industry responded to what the government wanted the industry to do. And I think there are people that are being cared for now that maybe weren't being cared for before. And that's a good thing. And there's more people that are being cared for now than there were before, and that's good thing. And I think the narrow focus on the ten visits was – doesn't really get to the point of why the reimbursement system was changed.

And clearly, once again, in this article between 2007 and 2008 for us, we took care of a lot of different types of patients. So I think there were some implications in the article that were not necessarily – that weren't necessarily true.

And I think if you really look at the article you'll see that what happened – as has happened over the history of healthcare, Medicare healthcare, as we've observed, the federal government decides that they want – they create their reimbursement systems to achieve certain objectives. And providers typically respond to those objectives that the government creates a reimbursement system for, i.e., DRG's when the hospitals were in – when the hospitals put the DRG system back in the 1980's, length of stays declined. And it's pretty simple. And I think, really, what we did in this – I don't think that the article said this, but I think our position is is the government wanted to create a greater distribution of care across a broader basis of people who are in need, and the industry responded.

50.    The statements above regarding compliance with law were false and misleading because (a) the Company had violated federal law through its scheme whereby the Company intentionally increased the number of in-home therapy visits to patients for the purpose of triggering higher reimbursement rates under the Medicare home health prospective payment system, as those excess visits were not always medically necessary; and (b) the Company was in material violation of its Code of Ethics & Business Conduct due to the scheme to inflate Medicare revenues.

## THE TRUTH BEGINS TO EMERGE

51.    On May 13, 2010, the Senate Finance Committee issued a release stating that it had started an investigation prompted by the April 26, 2010 Wall Street Journal article. The release stated that the Committee would "Question For-Profit Home Health Agencies on Relationship Between Operating Procedures and Reimbursements." The release further stated that "[f]inance leaders begin investigation after data suggests agencies intentionally increased the frequency of home health visits to trigger higher reimbursement rates." It went on, in pertinent part, to state:

Senate Finance Committee Chairman Max Baucus (D-Mont.) and Ranking Member Chuck Grassley (R-Iowa) today sent a letter to the four largest for-profit home health care agencies, asking questions about the relationship between the number of home health therapy visits they provided and the Medicare reimbursement rate for those visits. The Senators' letters come after a recent Wall Street Journal analysis, which found that as the Medicare reimbursement rate for

home health care changed, companies changed their business practices to achieve higher reimbursements.

Baucus and Grassley also questioned the companies regarding their promotional material, after the Committee obtained a patient questionnaire that appeared to be designed to help the company target Medicare patients for which it could be reimbursed.

"Too many Americans count on Medicare to provide quality health care to allow the program to be manipulated for somebody else's profit," said Baucus. "If for-profit companies want to work with the Medicare program, we have to hold them to a very high standard. Companies that work with Medicare should not be allowed to target seniors just because they have Medicare or adjust the way they care for patients simply to increase profits. I intend to closely review the practices of these and all companies working with the Medicare program to stop fraud, waste and abuse and ensure every dollar is used appropriately."

"Every dollar wasted is taken away from Medicare beneficiaries," Grassley said. "We need to make sure care is provided based on patients' best interests, not profit margins. So far, it appears that either the home health care reimbursement policy is flawed, some companies are gaming the system, or both. As the Senate committee of jurisdiction, we're working to figure out what's going on."

The Senators asked Amedisys, Almost Family, Inc., Gentiva Health Services, Inc., and the LHC Group, Inc. to answer questions related to their internal policies and guidelines regarding the number of visits provided to each patient, after data indicated a connection between the number of visits and the rate of reimbursement. According to the Journal's analysis, after Medicare rates increased for patients receiving more than nine visits, the number of Amedisys patients who received 10 visits was three times the number of patients who received nine visits. Baucus and Grassley also asked the companies about changes to their policies following changes to Medicare reimbursement rates in 2008, changes that were described by both the Journal's data and a March 2010 analysis by the Medicare Payment Advisory Commission (MedPAC). When the basis for Medicare payments shifted to 6, 14 or 20 visits, Amedisys patients getting 10 visits dropped by 50 percent, patients getting 14 visits rose 33 percent, and patients getting 20 visits increased 41 percent.

52.     The Senators also asked the companies to provide marketing materials and guidelines for patients and physicians as well as the clinical criteria used in developing those materials. The Senators expressed concern that these companies were using marketing tactics to target seniors 65 years old and older so the companies could take advantage of Medicare payments to improve profits.

53.     The May 13, 2010 release also revealed the content of the Senate Subcommittee's

May 12, 2010 letter to Defendant Yarmuth.  The letter stated in part:

> From 2000 through 2007, under the Medicare home health prospective payment system (PPS), home health agencies received an additional $2,200 in addition to the base reimbursement rate when HHAs made over nine therapy visits. During this period, the Wall Street Journal, reported that the number of patients a certain home health company visited 10 times was three times higher than the number of beneficiaries visited nine times. In fact, a former employee of this home health company stated that she had to "have ten visits to get paid" and "the tenth visit was not always medically necessary."

> Starting in 2008, CMS revised home health PPS rules to provide additional payments at six, 14, and 20 therapy visits. These additional payments also became graduated within these intervals. The home health industry apparently changed their utilization patterns as a result of these payment policy changes. In March 2010, the Medicare Payment Advisory Commission (MedPAC) found:

>> In 2008, the share of therapy episodes with decreased payments under the new system – those in the range of 10 to 13 therapy visits – dropped by about one third. . . . Conversely, volume increased for therapy episodes that have higher payment under the revisions. For example, in 2008 payment episodes with six to nine visits increased by 30 percent, and the share of the these episodes increased from 9 percent to 12 percent. At the higher end of the visit distribution, payment for episodes with 14 or more therapy visits increased by 26 percent, and the share of these episodes increased from 12 percent to 15 percent. The immediate change in utilization demonstrates that home health providers can quickly adjust services to payment changes in the therapy visit thresholds.

> According to an analysis by the Wall Street Journal, therapy visits by one of the leading home health companies followed these shifts. Apparently, the percentage of patients getting 10 therapy visits from one home health company dropped by 64 percent in 2008 from 2007. Also, the percentage of "patients of another home health company getting 10 visits dropped by 50 percent, while the percentage that got six visits increased 8 percent. The percentage of patients getting 14 visits rose 33 percent and the percentage getting 20 visits increased 41 percent."

> The findings reported in the Wall Street Journal article are of great concern to us, especially since they appear to be confirmed by MedPAC's research. These findings suggest that HHAs are basing the number of therapy visits they provide on how much Medicare will pay them instead of what is in the best interests of patients.

54.     The May 12, 2010 letter requested that the Company produce substantial amounts of data covering each year from 2006 through 2009, and instructed the Company to respond by June 2, 2010.

55.     On May 13, 2010, The Wall Street Journal published an article detailing the Senate Finance Committee's investigation of Almost Family and three of its competitors, Amedisys, LHC and Gentiva, for their Medicare billing practices.   The article disclosed, in pertinent part, as follows:

> The Senate Finance Committee launched an investigation into the practices of Amedisys Inc., the nation's largest home health-care company, and three other companies that provide in-home therapy visits reimbursed by Medicare.
>
> The committee is investigating whether the companies deliberately boosted the number of home therapy visits to trigger higher Medicare reimbursements.
>
> A Wall Street Journal article last month described how the companies' Medicare patients received a high number of the most profitable therapy visits, but few of the least profitable ones.
>
> The three other home health companies are  LHC Group Inc.,  Gentiva Health  Services Inc. and  Almost Family Inc.
>
> Companies "working with Medicare should not be allowed to target seniors or manipulate care simply to get higher reimbursement rates," said Sen. Max Baucus (D., Mont.), chairman of the finance committee, in a statement.
>
> "It appears that either the home health care reimbursement policy is flawed, some companies are gaming the system, or both," said Sen. Charles Grassley, (R., Iowa), ranking member of the committee. "We're working to figure out what's going on."
>
> The home therapy numbers cited in the article, which came from publicly available Medicare claims, "suggest home health agencies intentionally increased utilization for the purpose of triggering higher reimbursements," the senators wrote in letters that were emailed Wednesday to the chief executives of the four companies.
>
> Almost Family didn't provide comment. Representatives for LHC, Gentiva and Amedisys said they would cooperate with the probe.

31

The inquiry letters ask each CEO to provide information on their companies' therapy visits from 2006 through 2009 and about financial relationships with referring physicians.

56.    Also on May 13, 2010, Almost Family issued a press release in response to the

U.S. Senate Finance Committee investigation.  The Company stated as follows:

> Almost Family, Inc., a leading regional provider of home health nursing services, has received an inquiry letter from the U.S. Senate Finance Committee regarding an article in the April 26, 2010 edition of The Wall Street Journal. The Company intends to cooperate fully with the Committee's request for information related to the Company's historical home health operations.
>
> William Yarmuth, President and CEO of Almost Family, Inc., said, "We intend to fully cooperate with the Committee's request for information. Our Senior Advocacy mission calls for our caregivers to provide care based solely on patients' needs and clinical conditions and we are confident that when our data is thoroughly reviewed, it will provide a much clearer picture than was portrayed in The Wall Street Journal article."

57.    In response to the Company's press release and the revelation of the Senate

Committee's investigation into the Company's practices, Almost Family common stock dropped

$3.22 per share, or 7.56%, on a 459% increase in trading volume, to close at $39.37 per share on

May 13, 2010.  But for Defendants' false and misleading statements, the stock would have

dropped further.

58.    Finally, on July 1, 2010, the Company issued a press release revealing that

Almost Family was under investigation by the SEC, and that the SEC had issued a civil

subpoena for documents.  The press release stated:

> Almost Family, Inc., a leading regional provider of home health nursing services, announced today that on June 30, 2010 it received a civil subpoena for documents and notice of investigation from the Securities and Exchange Commission. The subpoena seeks documents related to the Company's home health care services and operations, including reimbursements under the Medicare home health prospective payment system, since January 1, 2000. The Company will supply the requested documents and cooperate fully with the SEC regarding the document request.
>
> William Yarmuth, President and CEO of Almost Family, Inc., said, "Following an article on home health care in the April 27, 2010 edition of The

Wall Street Journal, the U.S. Senate Finance Committee requested information from all of the publicly traded companies mentioned in that article. We have been cooperating fully with the Senate Finance Committee, and we will do the same with the SEC."

59. Also on July 1, 2010, the Dow Jones Business News published an article, "SEC Probes Home-Health-Care Firms' Reimbursements," discussing the SEC's investigation into Almost Family. The article disclosed the following relevant information:

> Home-health-care providers Amedisys Inc. (AMED) and Almost Family Inc. (AFAM) are being investigated by the Securities and Exchange Commission, a month and a half after the U.S. Senate began inquiring into their Medicare-reimbursement practices.
>
> The investigations revolve around whether the companies pushed patients into extra, sometimes unnecessary, home-health care visits in order to hit a threshold level that secured them thousands more in reimbursements from the government's health-care program.
>
> That practice, which the companies say wasn't nefarious, was earlier brought to light by a Wall Street Journal article in April and followed up weeks later by requests from the U.S. Senate Finance Committee. Amedisys and Almost Family both said they will be cooperating with the SEC probe.
>
> Two other peers, Gentiva Health Services Inc. (GTIV) and LHC Group (LHCG), were both involved in the Senate inquiry, but said they aren't under SEC investigation.
>
> LHC spokesman Eric Elliott told Dow Jones Newswires the company hasn't "received anything or had any contact with SEC." And Gentiva put out a statement saying it hasn't received notice of formal investigation or received a subpoena.
>
> An SEC spokesman declined to comment about any investigations.
>
> The shares of each dropped sharply in a broadly lower market Thursday, though some analysts rushed to say, as they had last month, that the companies will ultimately be cleared. Still, the SEC's move appeared to raise more questions as it was an agency some weren't expecting to get involved, and led to concerns other government inquiries may be in the works.
>
> Shares of Amedisys, the nation's largest home health-care company, slumped 14% to $37.87, while Almost Family slid 11% to $31.12. Gentiva was down 13% to $23.50 and LHC lost 10% to $24.91. The volumes on each were at least twice the average, while Amedisys was trading on eight times its typical volume.

33

The Senate had said it was focusing on whether the companies used extra visits, to get to 10 visits per patient, a level that would secure an additional $2,200 reimbursement from the government-run health-care program under a prior reimbursement schedule. When the rules were changed in 2008 to eliminate the $2,200 extra bonus in favor of incremental bonuses, a Wall Street Journal analysis found fewer patients were getting 10 visits.

The companies have said they were complying with Medicare requests by switching the practices, not using medically unnecessary visits simply for extra payouts.

60.    On July 1, 2010, after the SEC investigation was disclosed to the market, Almost Family's stock plummeted $3.88 per share, or 11.11%, reaching a low of $29.25 per share, on an increase of 285% in trading volume, ultimately closing at $31.05 per share.

## ADDITIONAL SCIENTER ALLEGATIONS

61.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

62.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Almost Family, were privy to confidential and proprietary information concerning Almost Family, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Almost Family, as discussed in detail below. Because of their positions with Almost Family, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees

34

thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

## LOSS CAUSATION/ECONOMIC LOSS

63.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Almost Family common stock and operated as a fraud or deceit on Class Period purchasers of Almost Family common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Almost Family common stock fell precipitously as the prior artificial inflation came out. As a result of their purchases of Almost Family common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.

64.     By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Almost Family's business and prospects. Defendants' false and misleading statements had the intended effect and caused Almost Family common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $51.47 per share on November 7, 2008.

65.     As a direct result of the disclosures in the April 26, 2010 Wall Street Journal article, the May 13, 2010 Senate Finance Committee disclosures and the announcement of the SEC investigation on July 1, 2010, Almost Family common stock fell precipitously. These drops removed the artificial inflation from the price of Almost Family common stock, causing real

economic loss to investors who had purchased Almost Family common stock during the Class Period.

66.    The declines were a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the price declines in Almost Family common stock negates any inference that the loss suffered by plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, i.e., damages, suffered by plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Almost Family common stock and the subsequent significant declines in the value of Almost Family common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

67.    The market for Almost Family common stock was open, well-developed and efficient at all relevant times.  As a result of Defendants' materially false and misleading statements and failures to disclose, Almost Family common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Almost Family common stock relying upon the integrity of the market price of Almost Family common stock and market information relating to Almost Family, and have been damaged thereby.

68.    At all relevant times, the market for Almost Family common stock was an efficient market for the following reasons, among others:

(a)    Almost Family common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

36

(b)     As a regulated issuer, Almost Family filed periodic public reports with the SEC and the NASDAQ;

(c)     Almost Family regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Almost Family was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

69.     As a result of the foregoing, the market for Almost Family common stock promptly digested current information regarding Almost Family from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of Almost Family common stock during the Class Period suffered similar injury through their purchase of Almost Family common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

70.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the

extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Almost Family who knew that those statements were false when made.

## CLASS ACTION ALLEGATIONS

71.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired the common stock of Almost Family during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

72.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Almost Family's common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Almost Family or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

73.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

74.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

75.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Almost Family;

(c)     whether the price of Almost Family common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

76.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

39

## COUNT I

### Violation of §10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

77.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

78.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

79.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

80.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Almost Family common stock. Plaintiff and the Class would not have purchased Almost Family common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

81.     As a direct and proximate result of Defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Almost Family common stock during the Class Period.

## COUNT II

### Violation of §20(a) of the Exchange Act
### Against All Defendants

82.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

83.     The Individual Defendants acted as controlling persons of Almost Family within the meaning of §20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of Almost Family, and their ownership of Almost Family stock, the Individual Defendants had the power and authority to cause Almost Family to engage in the wrongful conduct complained of herein. The Company controlled the Individual Defendants and all of its employees. By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury.

41

Dated:  September 3, 2010

/s/Anne Milton McMillin
Ewing, McMillin & Willis
C. David Ewing
Anne Milton McMillin
1100 Republic Building
429 W. Muhammad Ali Boulevard
Louisville, KY 40202
Email:  emwlaw@bellsouth.net
Email:  ammatty@bellsouth.net
Tel: (502) 585-5800
Fax: (502) 585-5858

Cohen Milstein Sellers & Toll PLLC
Steven J. Toll
Daniel S. Sommers
Joshua M. Kolsky
1100 New York Avenue N.W.
West Tower, Suite 500
Washington, DC 20005-3964
Email: s.toll@cohenmilstein.com
Email: d.sommers@cohenmilstein.com
Email: j.kolsky@cohenmilstein.com
Tel: (202) 408-4600
Fax: (202) 408-4699

*Attorneys for Plaintiff*